**In re Anonymous No. 30 D.B. 87**

Disciplinary Board Docket no. 30 D.B. 87.

To the honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

McDONALD, *Member,* September 29, 1988 — Pursuant to rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the disciplinary board of the Supreme Court of Pennsylvania herewith

submits its findings and recommendations to your honorable court.

## HISTORY OF PROCEEDINGS

This matter was initiated by a petition for discipline filed April 27, 1987. The case involved 10 charges filed by disciplinary counsel against respondent, [    ], for violating various disciplinary rules between the years 1982 and 1986, while representing clients in the practice of law in [    ], Pennsylvania.

In the fall of 1986, the respondent left the practice of law in Pennsylvania and apparently moved to the [    ], Maryland, area without keeping the board aware of his address; in fact, he did not maintain a current mailing address. The last registration statement filed by respondent with the board was dated July 29, 1985. All efforts to locate him by both petitioner and many individuals who testified were futile. Documentation of the petitioner's attempts to locate the respondent are set forth in petitioner's exhibit 1 (the motion for appointment of a hearing committee and exhibits). No proof that the petition for discipline was ever physically served upon the respondent is available, the petitioner therefore relies on substituted service as authorized by Pa.R.D.E. 212.

Respondent did not appear or file an answer to the petition for discipline and, on September 30, 1987, petitioner filed a motion for appointment of a hearing committee setting forth the attempts made to serve respondent. The matter was deemed to be at issue and was referred to hearing committee [    ] on October 2, 1987. On October 19, 1987, the matter was scheduled for hearing on November 11, 1987. Extensive efforts to serve the notice of hear-

ing on respondent were made and met with no success. A pre-hearing telephone conference was held November 2, 1987; respondent was sent notice of the time of this conference but did not contact the Office of Disciplinary Counsel, nor did he participate in the conference.

The hearing was held on November 11, 1987, as scheduled, at which time numerous witnesses testified and exhibits were admitted. Respondent did not appear in person or by counsel at the hearing. However, a letter from respondent received without return address two days before the hearing was admitted into evidence. The letter reflected an awareness of the disciplinary inquiry and specifically requested that it be placed in the record of any proceeding. The hearing committee also authorized the taking of testimony of additional witnesses by deposition. Two were inmates of state correctional institutions, two were bank officers testifying as to the identity of exhibits, and the fifth was ill the day of the hearing. The authorized depositions were taken on November 17 and 19, 1987.

Respondent communicated with disciplinary counsel by letter dated June 8 and June 29, 1988, and with hearing committee member, [       ], by letter dated June 29, 1988. In those letters the respondent acknowledged "outstanding responsibilities" and requested a return to active status. In the letter of June 8, 1988 respondent supplied disciplinary counsel with his correct mailing address; however, in the letter of June 29, 1988, respondent advised disciplinary counsel that his address was being changed and he refused to provide the new address. In the June 29, 1988, letter respondent requested an opportunity to meet with the hearing committee members personally and that he, respondent, would provide 30 days notice as to the

dates when he would be available to meet. No further contact from respondent has been received. The report of the hearing committee recommending disbarment was filed with the board July 21, 1988. No exceptions to that report and recommendation have been filed.

## FINDINGS OF FACT

The board substantially adopts the findings of fact of the hearing committee as follows:

(1) Petitioner, whose principal office was situated at 300 North Second Street, Commerce Building. Third Floor, Harrisburg, Pennsylvania, is vested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement (Pa.R.D.E.) with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

.(2) Respondent, [     ], was admitted to practice law in the commonwealth on November 26, 1973, and maintained a law office at [     ] Pennsylvania until approximately November 1985. The last registration statement filed by the respondent with the board was in 1985. His whereabouts now are unknown after diligent investigation, but he was last known to reside in or near [     ], Maryland. His last registered address with the Administrative Office of the Pennsylvania Courts is [     ], which post office box has been closed without forwarding address.

(3) Service of the petition for discipline and the notice of hearing were made by substituted service in accordance with Pa.R.D.E. 212 due to respondent's unavailability. However, the board finds that

respondent did have actual knowledge of the pendency of disciplinary inquiry and of the scheduling of the hearing, on the basis of a letter from respondent, without return address, which was received by the Office of Disciplinary Counsel two days before the hearing, which letter was admitted as petitioner's exhibit no. 2.

(4) The board further finds, on the basis of attempted contacts with the respondent made by [      ], former investigator for the Office of Disciplinary Counsel, and on the basis of information provided by [ A ] of the [      ] post office, that respondent has for some time had actual knowledge of the disciplinary inquiry into his actions, and that he has willfully and knowingly attempted to avoid and evade service of any notice of the disciplinary proceedings.

(5) Furthermore, respondent's letters of June 29, 1988 to disciplinary counsel, and hearing committee member [      ], indicates a blatant disregard for the procedural process of our disciplinary system, as well as respondent's willful refusal to permit communication with him.

### Charge I: Complaint of Office of Disciplinary Counsel File no. [      ]

(6) For several years prior to October 1986, respondent was an attorney maintaining a law office in [      ] Pennsylvania.

(7) During the last two years he practiced in Pennsylvania, 1984-1985, respondent's practice consisted primarily of criminal work, which was entirely handled by associates, and personal-injury collection matters, which were handled directly with insurance companies by his bookkeeper/paralegal. Personal-injury matters which involved litigation or did not appear to offer

quick settlement were referred to another law firm. Respondent himself never appeared in court in his last two years of practice.

(8) As of July 29, 1985, respondent held two active accounts with [ B ] Bank: no. [     ], identified on his checks as his "escrow account" and into which his client funds were deposited, and no. [     ], a personal account.

(9) Between September 1984 and October 1985, respondent maintained funds of at least 50 identified clients in his "escrow account," no [   ]. The combined claims of these 50 clients, matched against the end-of-month balances of respondent's escrow account, were as follows:

| Date | Balance | Claims |
|---|---|---|
| Sep 84 | 10,977.76 | 12,584.00 |
| Oct 84 | 9,578.09 | 9,868.00 |
| Nov 84 | 6,944.09 | 58,649.97 |
| Dec 84 | 36,914.06 | 51,937.97 |
| Jan 85 | 21,709.06 | 51,570.47 |
| Feb 85 | 5,587.59 | 76,337.28 |
| Mar 85 | 980.48 | 84,228.23 |
| Apr 85 | 1,922.59 | 109,841.84 |
| May 85 | 9,003.36 | 129,229.68 |
| Jun 85 | 22,855.33 | 130,710.68 |
| Jul 85 | 19,313.95 | 156,860.68 |
| Aug 85 | 14,461.63 | 163,022.03 |
| Sep 85 | 13,074.42 | 119,747.03 |
| Oct 85 | 0.00 | 116,322.19 |

At all times from September 30, 1984, until he closed the account, the claims of respondent's clients to funds in the account exceeded the balance of the account.

(10) Between September 28, 1984, and the time respondent closed the account on September 19, 1985, respondent wrote 221 checks in the total

amount of $297,065.48 on his escrow account no. [    ], all for his personal or office purposes, or uses other than those intended by the clients. By expending client funds in the sum of $297,065.66, including 89 checks to himself or to "cash" in the total sum of $209,404.40, respondent converted the funds of his clients to his own use and benefit.

(11) Checks disbursed by the respondent from his escrow account for his own purposes or for purposes other than those of the clients included:

(a) Numerous checks to pay the salaries of his office staff;

(b) Numerous checks to pay other expenses of his practice, including advertising bills, office rent, utilities, equipment rentals, and office furnishings;

(c) Several payments for rentals on a luxury condominium respondent maintained for his own use at the [    ] Hotel in [    ], Maryland;

(d) Numerous expenditures for payments on respondent's personal loans, car payments, car repairs, and personal medical insurance;

(e) Several payments toward respondent's personal tax obligations to the Internal Revenue Service and the Pennsylvania Department of Revenue; and

(f) Several payments for rental on an apartment occupied by a woman with whom the respondent had formerly lived.

(12) Between September 1984 and October 1985, respondent made 18 deposits consisting of or including cash into his escrow account, in the total amount of $103,675.80. Respondent's deposit of personal funds into the same account as his client escrow funds constituted a commingling of funds in violation of DR 9-102(A).

(13) The respondent's bookkeeper testified that virtually no records such as journals and client ledg-

er cards were maintained by respondent as to the status of the escrow account, other than a legal tablet on which she kept a list of the clients' names, the approximate date and amount the client was to be paid; and that respondent did not review the monthly statements on the account or perform reconciliations of the accounts, or allow his staff to do either.

(14) The respondent's bookkeeper further testified that respondent instructed his staff to call the bank each morning and determine whether respondent's personal account was overdrawn, and that if it was, she was directed to make out a check from the escrow account sufficient to cover the overdraft in the personal account. Near the end of respondent's practice of law in Pennsylvania, this happened "almost every day."

(15) The respondent's bookkeeper further testified that disbursements of funds to clients were controlled by the firm's cash flow; that disbursements were often delayed until the firm received funds of other clients; and that clients were more likely to receive their funds sooner if the amount they were receiving was smaller, or if they "called or threatened" more than others.

(16) On September 19, 1985, respondent withdrew the entire balance of his escrow account in the sum of $13,074.42, at a time when client claims against it constituted at least $119,747.03.

(17) On September 25, 1985, respondent deposited the check for $13,074.42 from his [ B ] Bank escrow account into his [ C ] deposit "escrow account" no. [      ].

(18) Between September 25 and October 1, 1985, respondent deposited into this account additional settlements in the following names and accounts:

| [ D ] | $8,000 |
| [ E ] | 3,500 |
| [ F ] | 9,000 |
| [ G ] | 3,500 |
| [ H ] | 3,000 |
| Total | $27,000 |

(19) By making disbursements to these clients as well as to [I] and [J], [K], and [L], respondent reduced the balance on this escrow account to $536.01 by October 31, 1985.

(20) Between September 1984 and May 1985 respondent also maintained a personal checking account at [B] Bank, no. [   ], out of which he frequently paid expenses relating to his law practice such as salaries, fees and costs, advertising fees, and office expenses such as rent and supplies, and into which he often deposited fees.

(21) Between August 1985 and November 1985, respondent also maintained a personal account at [C] Deposit Bank, no. [   ], out of which he frequently paid expenses relating to his practice such as salaries, office rent and supplies, and fees and costs, and into which he often deposited fees.

(22) Between September 1984 and June 1986, the combined end-of-month balances on respondent's four Pennsylvania accounts, matched against the claims of his 50 clients, were as follows:

| Date | [B] Escrow | [B] Personal | [C] Dep. Escrow | [C] Dep. Personal | Balance All Accts | Total Claims |
|---|---|---|---|---|---|---|
| Sep. 84 | 10,977.76 | 524.33 | —— | —— | 11,502.09 | 12,584.00 |
| Oct. 84 | 9,578.09 | 747.12 | —— | —— | 10,325.21 | 9,868.00 |
| Nov. 84 | 6,944.09 | 2,717.06 | —— | —— | 9,661.15 | 58,649.97 |
| Dec. 84 | 36,914.06 | 768.03 | —— | —— | 37,682.09 | 51,937.97 |
| Jan. 85 | 21,709.06 | 46.14 | —— | —— | 21,755.20 | 51,570.47 |
| Feb. 85 | 5,587.59 | (76.36) | —— | —— | 5,511.23 | 76,337.28 |
| Mar. 85 | 980.48 | 6,481.62 | —— | —— | 7,462.10 | 84,228.23 |
| Apr. 85 | 1,922.59 | 856.69 | —— | —— | 2,779.28 | 109,841.84 |
| May 85 | 9,003.36 | 936.90 | —— | —— | 9,940.26 | 129,229.68 |

| Date | [B] Escrow | [B] Personal | [C] Dep. Escrow | [C] Dep. Personal | Balance All Accts | Total Claims |
|------|-----------|-------------|-----------------|-------------------|-------------------|--------------|
| Jun. 85 | 22,855.33 | (4.00) | —— | —— | 22,851.33 | 130,710.68 |
| Jul. 85 | 19,313.95 | 0.00 | —— | —— | 19,313.95 | 156,860.68 |
| Aug. 85 | 14,461.63 | —— | 50.00 | 2,759.25 | 17,270.88 | 163,022.03 |
| Sep. 85 | 13,074.42 | —— | 45.00 | 1,098.94 | 14,218.36 | 119,747.03 |
| Oct. 85 | 0.00 | —— | 11,900.01 | 4,087.68 | 15,987.69 | 119,922.19 |
| Nov. 85 | —— | —— | 536.01 | 311.62 | 847.63 | 116,322.19 |
| Dec. 85 | —— | —— | 31.01 | (0.38) | 30.63 | 116,322.19 |
| Jan. 86 | —— | —— | 26.01 | —— | 26.01 | 116.322.19 |
| Feb. 86 | —— | —— | 21.01 | —— | 21.01 | 116,322.19 |
| Apr. 86 | —— | —— | 11.01 | —— | 11.01 | 116,322.19 |
| May 86 | —— | —— | 6.01 | —— | 6.01 | 116,322.19 |
| Jun. 86 | —— | —— | 1.01 | —— | 1.01 | 116,322.19 |

(23) At all times from November 1984 until the present, the funds respondent maintained in Pennsylvania accounts have been less than the aggregate claims his clients have against them, and therefore he has converted said funds of the clients to his own use and benefit.

(24) During the period of time from December 1984 until June 1986, respondent also maintained an unknown number of accounts at [M] Bank, [   ], Maryland, out of which payments to several of these clients were made and into which some funds of clients were deposited.

(25) The transfer to or maintenance of client funds in any account with [M] Bank in Maryland does not comply with the requirement of DR 9-102(A) that client funds be maintained in an identifiable account or accounts within Pennsylvania.

*Charge II: [N], File no. [   ]*

[26] In late 1984 respondent was representing [N] in a workers' compensation claim arising out of an injury she suffered while working for [O] Corporation.

(27) [N] is a disabled individual with a seventh-grade education, who was illiterate at the time of

her dealings with respondent, and who now reads at a second-grade level. She expressed her complete faith and trust in the respondent at the time of her dealings with him.

(28) [N] was awarded a commutation of $49,922.27 by the [P] Insurance Company, insurer for [O]. [N's] share of this award was paid by a check for $38,853.97, issued November 20, 1984, to respondent as attorney for [N].

(29) Respondent's 20 percent fee in the amount of $9,984.50 was paid the same day by separate check.

(30) When [N's] $38,853.87 settlement check arrived, respondent did not turn it over to her, but had her endorse it and deposited it into his [B] Bank escrow account no.. [   ] on November 30, 1984. Respondent deposited $42,653.97 into his escrow account on November 30, 1984, representing [N's] check for $38,853.79 and a settlement check on behalf of another client for $3,800. Prior to that deposit, the balance on this account was $6,444.09.

(31) Respondent initially told [N] that she would receive $300 per week out of her settlement, and that he would look into purchasing some land she was interested in. Subsequently, [N] requested that payments of $1,200 per month be made to her rather than $300 per week.

(32) Respondent began issuing periodic payments of $300 to [N] in November 1984, although he had no authority from [N] or the workers' compensation system to withhold the full check issued to her benefit. He wrote checks in the amount of $300 to her on November 30, December 5, and December 14, one in the amount of $1,500 on December 18, and one for $100 on December 31, reducing her principal balance to $36,353.97 by the end of December 1984, exclusive of any interest.

(33) Between November 30, 1984, when he deposited [N's] money into his escrow account, and December 31, 1984, respondent wrote 15 checks in the aggregate amount of $37,698 on that account for purposes other than [N's], including 11 checks to "cash" in the aggregate amount of $26,166, reducing the balance of the account to $25,900.06 as of December 31, 1984. As [N's] claim on the account at that point was $36,353.97, respondent had converted at least $10,453.91 of her funds to his own use and benefit as of December 21, 1984.

(34) Between January 1, 1985, and February 8, 1985, respondent paid [N] an additional $3,150.69 from the funds he was holding for her benefit, and paid a bill on her behalf in the amount of $703.28.

(35) On or about February 11, 1985, respondent induced [N] to allow him to retain $25,000 for unnamed "investments," upon which he promised a return rate of 30 to 33 percent. He paid [N] the sum of $7,500 ostensibly leaving $25,000 of her funds in his account. In fact, the balance on his escrow account at that time was $13,087.59. When his check to [N] was paid on February 12, 1985, the balance on the account dropped to $5,587.59, indicating a conversion of at least $19,412.41 of the $25,000 supposedly held in trust.

(36) Respondent did not discuss the nature of these "investments" with [N], nor did he advise her to seek independent legal advice before entering into the transaction with her.

(37) Respondent made periodic payments to [N] between February 20, 1985, and October 3, 1985, in the total amount of $10,800, bringing her balance, exclusive of any interest, to $14,200.

(38) The balance on respondent's escrow account was less than the amount of [N's] claim on the ac-

count at all times thereafter, except for brief intervals:

(a) Respondent's escrow account was overdrawn in the amount of $405.46 on May 7, 1985. On that day, he deposited two checks in the total of $22,500 received on behalf of [Q] and [E], bringing the balance on his account to $22,094.54, which was more than [N's] claim for $21,700 (although obviously less than the amount respondent owed to [Q], [E] and [N] together). On May 9, 1985, respondent wrote two checks for a total of $732 to another client which reduced the balance on his account below the amount he owed [N].

(b) On June 7, 1985, respondent deposited a settlement check for $50,000 received on behalf of [R], another client, temporarily raising the balance on his escrow account to $52,575.36, which was more than [N's] claim for $19,000 (but less than the sum of [N's] and [R's] claims). By June 17, 1985, he had reduced the balance on the escrow account to $14,873.44, less than [N's] claim of $19,000.

(c) On July 11, 1985, respondent deposited into the account a settlement of $30,000 on behalf of another client, [S], raising the balance to $35,888.71, above [N's] claim of $19,000, although not above the sum of her and the other client's claims. By July 17, 1985, he had again spent the account down to $16,656.45, below [N's] claim of $17,800. At this point, he had not distributed settlement shares to [Q], [R] or [S].

(d) On August 5, 1985, respondent deposited $15,000 of his own funds into the escrow account, after the balance on the account had dropped to $883.89. The next day he deposited two more settlement and fee checks in the total of $13,875 into the account, raising the balance to $21,566.29 at a time when he owed [N] $17,800. Nevertheless, on Au-

gust 7, 1985, three checks respondent had written in the aggregate amount of $7,548 were returned for insufficient funds, including a $5,000 check respondent had written himself for "cash." By this time, respondent was hopelessly out of trust with regard to [N] and dozens of other clients.

(39) On September 19, 1985, respondent closed out his [B] Bank escrow account by cashier's check in the amount of $13,074.42.

(40) On September 25, 1985, respondent deposited the check he had received from the [B] Bank account into a newly opened account at [C] Deposit Bank. By December 16,1985, he had reduced the balance on that account to $31.01.

(41) In November 1985, respondent advised [N] that he was leaving the area and moving to Maryland. Respondent provided her with a Maryland telephone number where he could allegedly be reached.

(42) Respondent mailed three more payments in the total amount of $2,400 to [N] in December 1985. Respondent never made any further payment on the "investment," of which at least $10,600, exclusive of any interest, remains unpaid.

(43) The telephone number respondent gave [N] was disconnected, and her efforts to reach him were unavailing.

44) Respondent converted all of [N's] funds to his own use and benefit, and at least $10,600 remains unpaid.

(45) [N] received reimbursement for $11,303.28 of her loss from the Pennsylvania Client Security Fund.

*Charge III: [T] Matter, File [ ]*

(46) On September 3, 1984, [T] was involved in an automobile accident with a driver named [U].

(47) On March 5, 1985, [T] retained respondent on a contingent-fee basis to represent her in a claim for damages against [U]. Respondent's fee was to be one-third of the sum recovered.

(48) On May 2, 1985, a settlement was reached with [V] Insurance Company, [U's] insurer, in the amount of $4,500. A check for that amount was given to respondent by [V].

(49) Respondent deposited the [V] check in the sum of $4,500 in his [B] Bank custom checking account no.[    ] on May 3, 1985.

(50) In May 1985, respondent advised [T] that he would have her settlement check to her within one month, and that she should call him if she did not receive it.

(51) On May 29, 1985, [T] should have had a credit of approximately $3,000 with respondent's office, representing her recovery less $1,500 in fees and some miscellaneous costs and expenses.

(52) On May 29, the bank charged against respondent's account check no. 710 in the amount of $1,465 on a balance of $4,033.36, causing his balance to fall to $2,538.36, which was less than the funds he was holding for [T]. At that point, some part of her funds were therefore diverted to his own purposes.

(53) On June 4, 1985, the bank charged against respondent's account checks no. 736 in the amount of $3,000 and 732 in the amount of $1,000 on a balance of $4,375.36, again reducing the balance of the account to $373.36, less than the amount owing to [T]. At that point, some portion of her funds were once again diverted to his own purposes.

(54) [T] called respondent's office several times in June and July 1985. Each time she was told by his secretary that he was not in but would return her call. None of the calls were returned nor did [T]

receive any explanation as to why her funds had not been released to her after nearly three months.

(55) Respondent's custom checking account no. [ ] was overdrawn on July 26, 1986, so at that point all of [T's] settlement had been diverted to his own use.

(56) If the claims of respondent's other clients are taken into account, respondent was seriously and continuously out of trust with regard to account no. [ ] at all times that [T's] funds were deposited therein.

(57) On July 26, 1985, [T] filed a disciplinary complaint.

(58) On July 30, 1985, respondent mailed a settlement check in the amount of $2,937.40 to [T]. No explanation was provided as to what costs or expenses reduced her recovery from $3,000 to $2,937.40.

(59) Respondent's escrow account was overdrawn on July 26, 1985, and again on August 1, 1985.

(60) The check respondent wrote to [T] was paid by his bank on August 19, 1985, against a balance of $17,117.92. Between the time [T's] check was written and the time it was paid, eleven checks written by the respondent were dishonored for insufficient funds, and he deposited $62,000 in cash and transfers from personal accounts into the escrow account.

*Charge IV: [W] Matter, File no. [ ]*

(61) On June 19, 1985, respondent's office was retained by [W] to represent his son [ ] in a claim relating to an automobile accident. [X], Esq., provided legal services on the [W] case while employed as respondent's associate.

(62) On or about October 30, 1985, a settlement check in the amount of $1,350 arrived in respondent's office. Mr. and Mrs. [W] came to respondent's office, met with him, and endorsed the settlement check, which respondent retained. Respondent negotiated the check, but did not deposit it into any of his Pennsylvania accounts.

(63) Respondent told Mr. and Mrs. [W] that a check for their recovery would be issued by the court to be set aside in a trust fund for their son. This was not true.

(64) On November 20, 1985, respondent wrote a check in the amount of $966.66 to Mr. and Mrs. [W] on account no. [ ], [M] Bank N.A. of [ ], Maryland, and sent it to the [W] in settlement of the claim.

(65) The [W's] deposited respondent's check in their bank account on January 11, 1986. On February 3, 1986, they received notice that the check had been returned from his bank for reasons not specified. In fact, his account had insufficient funds to cover the check he had written.

(66) The [W's] contacted [X], who advised them he would attempt to get in touch with respondent about the matter. [X] wrote to respondent on March 28, 1986, urging him to resolve the matter.

(67) On or about February 12, 1986, respondent telephoned [W] and told him to go ahead and redeposit the check, and advised him that respondent would tell him when to do so. Respondent never contacted him again.

(68) [W] redeposited the check on March 24, 1986, and again in May 1986. Both times the check was returned marked "not sufficient funds."

(69) At all times since October 30, 1985, respondent has wrongly held money belonging to the [W] in a sum of at least $966.66, has failed to pay

said funds to which the client is entitled upon demand, and has converted said funds to his own use and benefit.

### Charge V: [Y] Matter, File no. [   ]

(70) On October 1, 1982, [Z], on behalf of her brother [Y], agreed to retain the respondent to represent her brother in a criminal action in [   ] County, Pennsylvania.

(71) Respondent stated to [Z] that his fee for representing her brother would be $1,000, of which she paid respondent $600 of [Y's] money in cash on October 1, 1982. Respondent did not advise [Z] that the retainer was not refundable.

(72) A few days later, [Z] came to respondent's office to deliver the balance of $400 and was advised that his fee would be an additional $1,900.

(73) [Z] declined to pay this additional amount and did not retain respondent's services any further.

(74) Respondent never provided any services to [Y] to earn the $600 and was not retained on his behalf.

(75) [Z] requested that respondent refund the $600 she had paid him, and he verbally agreed to do so.

(76) [Z] and [Y] requested several times thereafter that respondent refund the unearned fee, but he failed or refused to do so.

### Charge IV: [AA] Matter, File no. [   ]

(77) In or about March 1983, [AA] retained respondent to represent him in a claim against the Commonwealth of Pennsylvania, Civil Service Commission, for its alleged failure to advise him of the reasons for his failure of civil service examinations in 1970 and 1971.

(78) Respondent agreed to represent [AA] in a civil action on this cause for the sum of $6,000, which [AA] paid to respondent.

(79) On March 2, 1983, respondent wrote to [BB], chairperson of the State Civil Service Commission, setting forth [AA's] claim and requesting that he be contacted.

(80) On March 15, 1983, [CC], deputy director of the commission, replied to respondent's letter and advised him that the reason for rejection of the request was that the law only required that the records in question be preserved for 7 years, and that [AA's] request was received after the records were expunged.

(81) On October 30, 1984, respondent filed a civil rights action on behalf of [AA] against the Commonwealth of Pennsylvania, State Civil Service Commission, with the U.S. District Court for the [   ] District, at Civil no. [   ].

(82) This civil rights action was frivolous in that it was unwarranted under existing law or good faith extension, modification, or reversal of existing law.

(83) On February 25, 1985, the attorney general filed a motion to dismiss, which was duly served on respondent.

(84) On March 7, 1985, the deputy attorney general filed a brief in support of motion to dismiss, which was duly served on respondent.

(85) Respondent did not file a responsive brief. On March 27, 1985, the court entered an order dismissing the action on the ground that it was barred by the statute of limitations and by the Eleventh Amendment to the U.S. Constitution. Respondent was deemed not to have opposed the motion or failure to file a responsive brief.

(86) After filing the complaint, respondent did nothing to pursue the matter and earn the fee he charged [AA].

(87) Respondent knew or should have known that the action he filed was frivolous, and his agreement to accept a subtantial fee from [AA] to do so was an act of dishonesty and a violation of his duty to [AA] as advisor and counselor.

*Charge VII: The [DD] Matter, File no. [   ]*

(88) In December 1984, [DD] engaged respondent to represent them in potential lawsuit brought against them individually and as proprietors of [DD's] Tavern in [   ], [   ] County, Pennsylvania.

(89) The [DD's] paid respondent the total of $2,000 for his services in two checks for $1,000 each on December 26, 1984, and January 18, 1985. The former check was deposited with two checks in the amount of $200 into respondent's personal account no. [   ] at [B] Bank on December 26, 1984, and was substantially expended by December 28, 1984, when the balance on that account was $293.15. The second check was deposited into the same account on January 21, 1985, at a time when the account was overdrawn by $687.32; that account, including the complainants' fee, was overdrawn again the next day.

(90) The lawsuit against the [DD's] was filed and docketed as *[EE], Administrator, v. [FF] and [DD]*, to no. [   ] in the Court of Common Pleas for [   ] County.

(91) Respondent entered his appearance for the [DD's] by filing an answer on their behalf on February 20, 1985.

(92) On April 17, 1985, counsel for plaintiff filed a set of requests for admissions on respondent. On

April 24, 1985, counsel for the plaintiff filed a second set of requests for admissions on respondent.

(93) Respondent failed to file any response to the requests for admission or to take any steps to protect the [DD's] in the case.

(94) On June 13, 1985, a petition seeking court approval for a settlement against the [DD's] co-defendant was filed, and the co-defendant was subsequently released from liability in the matter.

(95) On August 8, 1986, the court entered an order settling pretrial conference in the continuing case against the [DD's] for August 21, 1986. A copy of this notice was duly served upon respondent.

(96) On August 21, 1986, respondent did not appear at the pretrial conference on behalf of the [DD's]. [X], respondent's former associate, appeared to advise the court that respondent had left the area and that he was not representing them.

(97) The court, in an order dated August 21, 1986, set jury selection for October 20, 1986, advised the [DD's] to retain other counsel, and also referred them to the disciplinary board and the client security fund of the Supreme Court.

(98) The [DD's] subsequently retained other counsel who was able to obtain leave to file late answers to the requests for admissions, which would have been highly prejudicial to the [DD's] if admitted.

(99) The [DD's] were successful in their defense, and a verdict was entered in their favor, while a verdict for $500,000 was entered against their co-defendant.

(100) Respondent withdrew from representing the [DD's] without notice or taking reasonable steps to protect their interests; without leave of court; and without refunding the unearned portion of their fees paid in advance.

*Charge VIII: The [GG] Matter, File [    ]*

(101) In February, 1985, [GG] engaged respondent to represent him in a driving under the influence charge.

(102) Respondent charged [GG] a fee of $2,200 for representation in his case, which was to include trial and appeals, and which he paid to respondent on February 8, 1985.

(103) Respondent subsequently advised [GG] to plead guilty to the charge, which he did.

(104) Respondent did not earn the full $3,200 fee by the services respondent provided in the matter due to [GG's] guilty plea.

(105) Respondent's associate indicated to [GG] that he should receive a refund of the unearned portion of his fee based on the fact that the matter did not go to trial or appeal, but respondent failed to provide him with a refund despite several requests to do so.

*Charge IX: The [HH] Matter, File no. [    ]*

(106) On or about August 30, 1985, respondent was retained by [HH] to represent him in defending charges for driving under the influence.

(107) Respondent's stated fee to [HH] was $5,000, which was to include representation at trial and through all appeals to the Supreme Court.

(108) [HH] paid respondent $2,500 toward his fee on August 30, 1985.

(109) [HH's] preliminary hearing was held September 24, 1985, at which time respondent's associate [X], Esq., represented [HH]. [X] estimated the value of his services at this hearing to be $500.

(110) When [HH's] arraignment was scheduled in December 1985, he contacted respondent's office and learned for the first time that respondent had left the practice of law in Pennsylvania.

(111) At that time, [HH] decided to employ other counsel.

(112) [HH] requested a refund of his fee paid in advance through [X], but respondent did not refund his money.

(113) Respondent did not earn more than $500 of the $2,500 [HH] paid him, and did not refund the unearned balance paid in advance.

*Charge X: The [II] Matter, File no. [        ]*

(114) [II], was convicted of murder in [    ] County, Pennsylvania, in 1977.

(115) In May, 1984, [II] retained respondent to represent him in a Post Conviction Hearing Act (PCHA) petition, which was filed May 24, 1984, and heard June 25, 1984. The scope of respondent's employment was that he was to represent [II] in the PCHA hearing and through all appeals for the fee paid.

(116) In November or December 1985, respondent wrote to [II] to advise him that respondent was closing his practice and that he was referring the matter to attorney [JJ].

(117) In fact, [JJ] had never agreed to take the case, and he referred the matter back to respondent's other former associate, attorney [X], who had received no compensation in the matter and was willing to represent [II] only in an entirely new attorney-client relationship. [X] subsequently represented [II] in the matter for a separate fee.

(118) Respondent failed to take all reasonable steps to avoid prejudice to [II], including giving him due notice of his withdrawal, affording him the opportunity to employ counsel of his choice, and delivering to him all papers to which he was entitled.

(119) Respondent received fees in the amount of $9,500 for representation of [II] in his appeal and

the post-conviction proceeding between October 1982 and November 1983.

(120) Respondent did not provide any accounting for how much of his fees had been earned to [II] or refund any unearned fees upon withdrawal.

## CONCLUSIONS OF LAW

After a careful and thorough review of the evidence the board finds that the respondent has violated the following disciplinary rules:

*Charge I: Complaint of Office of Disciplinary Counsel, File no. [ ]*

(a) DR 1 - 102 (A) (3), which prohibits a lawyer to engage in illegal conduct involving moral turpitude;

(b) DR 1 - 102 (A) (4), which prohibits a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) DR 1 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(d) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds to which he is not entitled;

(e) DR 9 - 102 (B) (3), which requires a lawyer to maintain appropriate records of funds of clients in his possession and render appropriate accounts; and

(f) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge II: [N], File no. [ ]*

(a) DR 1 - 102 (A) (3), which prohibits a lawyer to engage in illegal conduct involving moral turpitude;

(b) DR 1 - 102 (A) (4), which prohibits a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) DR 1 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(d) DR 2 - 110 (A) (2), which prohibits a lawyer to withdraw from representation of a client until he has taken reasonable steps to protect her interests;

(e) DR 5 - 104 (A), which prohibits a lawyer from entering into a business relationship with a client who is relying on his professional expertise, without disclosure and consent;

(f) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds on which he is not entitled.

(g) DR 9 - 102 (B) (3), which requires a lawyer to maintain appropriate records of funds of clients in his possesson and render appropriate accounts; and

(h) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge III: [T] Matter, File [        ]*

(a) DR 1 - 102 (A) (3), which prohibits a lawyer to engage illegal conduct involving moral turpitude;

(b) DR 1 -102 (A) (4), which prohibits a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) DR 1 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(d) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in

the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds to which he is not entitled;

(e) DR 9 - 102 (B) (3), which requires a lawyer to maintain appropriate records of funds of clients in his possession and render appropriate accounts; and

(f) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge IV: [W] Matter, File no. [       ]*

(a) DR 1 - 102 (A) (3), which prohibits a lawyer to engage in illegal conduct involving moral turpitude;

(b) DR 1 - 102 (A) (4), which prohibits a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(c) DR 1 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(d) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds to which he is not entitled;

(e) DR 9 - 102 (B) (3), which requires a lawyer to maintain appropriate records of funds of clients in his possession and render appropriate accounts; and

(f) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge V: [Y] Matter, File no. [       ]*

(a) DR 9 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(b) DR 2 - 110 (A) (3), which requires a lawyer upon withdrawing from representation of a client to refund the unearned balance of any fees paid in advance; and

(c) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge VI: [AA] Matter, File no. [      ]*

(a) DR 1 - 102 (A) (4), which prohibits a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(b) DR 1 - 102 (A) (5), which prohibits a lawyer to engage in conduct which is prejudicial to the administration of justice;

(c) DR 1 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(d) DR 2 - 106 (a), which forbids a lawyer to collect an excessive or unreasonable fee;

(e) DR 2 - 109 (A) (2), which forbids a lawyer to accept employment on behalf of a person to present a claim in litigation which is not warranted under existing law;

(f) DR 2 - 110 (A) (2), which forbids a lawyer to withdraw from a matter without taking reasonable steps to avoid foreseeable harm to a client; and

(g) DR 2 - 110 (A) (3), which requires a lawyer, upon withdrawing, to refund the unearned balance of fees paid in advance.

*Charge VII: The [DD] Matter, File no. [      ]*

(a) DR 1 - 102 (A) (5), which prohibits a lawyer to engage in conduct which is prejudicial to the administration of justice;

(b) DR 1 - 102 (A) (6), which prohibits a lawyer to engage in conduct which adversely reflects on his fitness to practice law;

(c) DR 2 - 110 (A) (1) and DR 2 - 110 (C), which forbids a lawyer to withdraw from a matter pending before a court without cause or without leave of court;

(d) DR 2 - 110 (A) (2), which forbids a lawyer to withdraw from a matter without taking reasonable steps to avoid foreseeable harm to a client; and

(e) DR 2 - 110 (A) (3), which requires a lawyer, upon withdrawing, to refund the unearned balance of fees paid in advance;

(f) DR 6 - 101 (A) (3), which forbids a lawyer to neglect a legal matter entrusted to him;

(g) DR 7 - 101 (A) (1), which forbids a lawyer to intentionally fail to seek the lawful objectives of the client through reasonably available means;

(h) DR 7 - 101 (A) (1), which forbids a lawyer to intentionally fail to carry out a contract of employment;

(i) DR 7 - 101 (A) (1), which forbids a lawyer to intentionally prejudice or damage his client in the course of the professional relationship; and

(j) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds to which he is not entitled.

*Charge VIII: The [GG] Matter, File no. [        ]*

(a) DR 2 - 106 (A), which forbids a lawyer to collect an excessive or unreasonable fee;

(b) DR 2 - 110 (A) (3), which requires a lawyer, upon withdrawing, to refund the unearned balance of fees paid in advance;

(c) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds to which he is entitled;

(d) DR 9 - 102 (B) (3), which requires a lawyer to maintain appropriate records of funds of clients in his possession and render appropriate accounts; and

(e) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge IX: The [HH] Matter, File no. [      ]*

(a) DR 2 - 106 (A), which forbids a lawyer to collect an excessive or unreasonable fee;

(b) DR 2 - 110 (A) (2), which forbids a lawyer to withdraw from a matter without taking reasonable steps to avoid foreseeable harm to a client;

(c) DR 2 - 110 (A) (3), which requires a lawyer, upon withdrawing, to refund the unearned balance of fees paid in advance;

(d) DR 2 - 110 (C), which forbids a lawyer to withdraw from a matter pending before a court without cause or without leave of court;

(e) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of own funds therein or to withdraw funds to which he is not entitled.

(f) DR 9 - 102 (B) (3), which requires a lawyer to maintain appropriate records of funds of clients in his possession and render appropriate accounts; and

(g) DR 9 - 102 (B) (4), which requires a lawyer to promptly pay a client funds in his possession to which the client is entitled.

*Charge X: The [II] Matter, File no. [      ]*

(a) DR 2 - 110 (A) (2), which forbids a lawyer to withdraw from a matter without taking reasonable steps to avoid foreseeable harm to a client;

(b) DR 2 - 110 (A) (3), which requires a lawyer, upon withdrawing, to refund the unearned balance of fees paid in advance; and

(c) DR 9 - 102 (A) (2), which requires a lawyer to maintain funds of clients in a separate account in the state where he practices, and forbids him to place any of his own funds therein or to withdraw funds to which he is not entitled.

In addition, the board concludes that service upon the respondent was effectuated by substituted service as authorized by Pa.R.D.E. 212 due to the respondent's obviously willful unavailability.

## DISCUSSION

Since it is not documented that respondent formally received service of process of the complaint, notice of hearing, and hearing committee report, this board carefully scrutinized the efforts made to assure that respondent received procedural due process. From our evaluation of the affidavits attached to exhibit 1, the various items of correspondence received in June 1988 from respondent, and the fact that respondent left Pennsylvania in 1986, did not maintain a forwarding address, and filed no registration with the board since July 1985, the board is fully satisfied that this respondent was afforded process that approached the ultimate in fair treatment. Every conceivable effort was made to locate him. In fact, it appears that the respondent made every effort to avoid judgment day with former clients and this board and engaged in a preconceived plan to avoid service of process.

Furthermore, even though respondent was not represented in this proceeding through his own refusal to participate, the rights of respondent were

fully protected by the diligent efforts of the hearing committee throughout this process. Nevertheless, the conduct of respondent evidences an egregious pattern of disgraceful conduct which mandates disbarment.

From 1984 through 1986, the respondent was continuously and increasingly out of trust, utilizing his clients' monies for personal benefit and purposes. Furthermore, time and time again he accepted retainer, promised to perform, failed to do so, and refused to return the monies. Respondent's callous disregard for the misplaced trust of clients such as [N], from whom he literally stole worker's compensation proceeds, leaves us no choice in this matter. Respondent is a disgrace to the profession and should be disbarred.

## RECOMMENDATION

The disciplinary board recommends as follows:

(1) That respondent, [    ], be disbarred from the practice of law in the Commonwealth of Pennsylvania.

(2) That respondent, [    ], be required to pay the costs of these proceedings.

## ORDER

And now, November 2, 1988, upon consideration of the report and recommendations of the disciplinary board dated September 29, 1988, it is hereby ordered that [respondent], be and he is disbarred from the bar of this commonwealth, and he shall comply with all the provisions of rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the disciplinary board pursuant to rule 208(g), Pa.R.D.E.